In re FACTOR VIII OR IX CONCENTRATE BLOOD PRODUCTS LITIGATION.

No. MDL–986.
No. 93 C 7452.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 17, 1996.

David S. Shrager, Philadelphia, PA, for plaintiffs.

Sara Gourley, Chicago, IL, Duncan Barr, San Francisco, CA, Richard Berkman, Philadelphia, PA, David I. Bell, Glendale, CA, for defendants.

### MEMORANDUM OPINION AND ORDER

GRADY, District Judge.

The broad question addressed in this opinion is whether a transferee court in multidistrict litigation under 28 U.S.C. § 1407 has the authority to limit the number of common-issue expert witnesses at trials which will take place after remand to the transferor districts. If the answer to that question is in the affirmative, then the second question is what the limit should be in this particular litigation.

### Background of the Litigation

Plaintiffs in these consolidated cases are persons suffering from hemophilia, a hereditary disease in which the protein that causes blood clotting is missing. The principal treatment for the disease is the intravenous injection of the missing protein, derived from the plasma of blood donors. Four of the defendants are pharmaceutical companies which collect and process the plasma to derive "factor concentrates," which are then sold for use by hemophiliacs. The manufacturing process for deriving the finished factor concentrate from blood plasma is known as "fractionating," and the four defendants involved in the present dispute are known as "fractionators."[1] Together, they produce all or virtually all of the factor concentrates used in the United States.

In the early 1980s, some hemophiliacs using the defendants' factor concentrates began to show symptoms of a disease later identified as Acquired Immune Deficiency Syndrome ("AIDS"). As is now known, this disease is transmitted by the Human Immunodeficiency Virus ("HIV"). Plaintiffs allege that they were infected with the virus as a result of injecting the defendants' factor concentrates derived from donors who were themselves infected. Plaintiffs allege a variety of negligent acts and omissions on the part of the fractionator defendants, principally the failure to sterilize their products to eliminate the possibility of viral infection (viral inactivation), failure to screen plasma donors so as to eliminate classes of persons, such as intravenous drug users, who presented a high risk of viral infectivity, failure to engage in "surrogate testing" of donors to determine whether they had viral infections (such as hepatitis) suggesting the possibility of other, undetectable viruses as well, failure to warn users of their products of the danger of infection once they knew or reasonably should have known that the newly observed symptoms were caused by a disease that was viral and blood-borne, and failure to withdraw their products from the market when the danger of infection became known.

Defendants have a variety of defenses to plaintiffs' negligence allegations. Among the more important are that the virus in question was unknown and unforeseeable during any period of time defendants were not taking the precautions plaintiffs claim they should have been taking and that, as soon as the presence of a new virus became apparent, they did all they reasonably could have done to eliminate it from their products. With regard to each of the measures plaintiffs allege should have been undertaken earlier, defendants respond with specific reasons as to why it was not feasible to do so. For instance, heat treatment of the concentrates,

---

**1.** The four fractionator defendants are Baxter Healthcare Corporation, Bayer Corporation, Alpha Therapeutic Corporation and Armour Pharmaceutical Company.

the method of viral inactivation plaintiffs claim should have been used, was not, in defendants' view, a procedure that was technologically effective or even legally permissible for them to use until most of the plaintiffs had already been infected with the virus. Defendants contend that they began the effective heat treatment of their products as soon as they were able to do so.

A number of lawsuits based upon diversity of citizenship were filed against the fractionators in various federal districts by infected hemophiliacs, their spouses, guardians, and personal representatives. On December 7, 1993, the Judicial Panel on Multidistrict Litigation transferred the then pending federal cases to this court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. The total number of cases now pending, including tag-a-longs, is approximately 192. Another 300 similar cases are pending in various state courts. A Steering Committee appointed by the court, chosen from among the attorneys who represent plaintiffs in individual cases, has been conducting the litigation on behalf of all plaintiffs.

Prior to the MDL consolidation, thirteen cases were tried to verdict in state and federal courts. Twelve verdicts were for defendants and the lone plaintiffs' victory was reversed on appeal. No cases have been tried subsequent to the MDL consolidation.

Not long after the MDL consolidation, plaintiffs moved for nationwide class certification in one of the cases, contending that the claims of the plaintiffs were typical of thousands of claims which had accrued to infected hemophiliacs across the country. We declined to certify all issues for class treatment, but did decide that certification of the negligence issues was appropriate pursuant to Rule 23(c)(4)(A) of the Federal Rules of Civil Procedure. *Wadleigh v. Rhone–Poulenc Rorer, Inc.*, 157 F.R.D. 410 (N.D.Ill. 1994). We were of the view that trial of the class action would effectively decide the litigation one way or the other, and therefore directed the parties to concentrate on preparing for trial of the class action. This concentration was consistent with the purpose of the MDL, inasmuch as the common issues which would have been tried in *Wad-*

*leigh* were identical to the common issues that prompted the MDL consolidation. However, *Wadleigh* was not to be tried, at least as a class action. Defendants had opposed class certification, and on a petition for a writ of mandamus, obtained a ruling from the Court of Appeals that class treatment was not appropriate. *Matter of Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995). Pursuant to the writ, we decertified the class.

The most recent development is that in April of this year the fractionator defendants made a joint offer to settle the claim of each infected hemophiliac who used any of their products (as well as the claims of persons who had become infected by reason of specified relationships with infected hemophiliacs) for the sum of $100,000.00. The parties jointly sought certification of a settlement class, which the court granted. There are various contingencies involved in the proposal (such as waiver of subrogation claims by medical providers and insurers), and we are unable to make a determination as to the fairness of the settlement until those matters are resolved. More than 6,000 claims have been filed by apparent class members who desire to accept the settlement. However, even if the settlement is ultimately approved, the MDL will run its course, because over 500 class members, including more than 200 who are the plaintiffs in 69 of the MDL cases, have opted out of the settlement. It appears that these opt-out cases are headed for eventual remand to the transferor districts for trial or other disposition.

The practical issue now pending before this court is *how much* discovery remains to be completed before the cases are ready for remand, and that brings us back to the questions posed in the opening paragraph of this opinion.

### How the Questions Arose

Until the present dispute arose, discovery had proceeded relatively smoothly, with no more than the usual number of questions requiring decision by the court. We were under the impression that both sides had the same view of what we are doing: conducting the discovery that is common to all of the

transferred cases and which is necessary to prepare them for trial. This obviously includes taking whatever depositions are necessary to acquaint the parties with the testimony of the common-issue witnesses who are likely to appear at each trial. For example, each side must depose the expert witnesses the other side is going to present on the question of what was known about blood-borne viruses, and how to prevent their transmission through blood products, in the late 1970s and early 1980s.

To establish the procedures that would govern the conduct of the litigation in this court, we entered a Case Management Order on May 5, 1994. The order was largely a result of cooperative effort. Much of it consists of agreed submissions by the parties, adopted *verbatim* by the court.

One of the agreed submissions incorporated *verbatim* was a definition of "Core Subjects for Discovery."[2] The next paragraph of the Case Management Order, another agreed submission, sets forth, in the parties' language, the discovery schedule they requested:

| Discovery | Date Completed |
|---|---|
| All Non–Expert Discovery | February 1, 1995 |
| Expert Identification: | |
| —Plaintiffs | February 28, 1995 |
| —Defendants | April 30, 1995 |
| Expert Depositions | July 31, 1995 |

Except for good cause shown, relief from the above schedule shall not be granted, and all discovery shall be completed by July 31, 1995.

2. This is Paragraph 10 of the Case Management Order, which reads as follows:

10. *Core Subjects for Discovery.* The following are deemed core subjects for MDL–986 discovery:
(A) Plaintiffs' hemophilia treatment, including use, *source and identification of blood* and blood derivatives
(B) Viral infectivity of blood and blood derivatives used by plaintiffs
(C) Laboratory tests and results regarding plaintiffs' HIV infection
(D) Plaintiffs' alternative risk factors
(E) General nature and treatment of hemophilia
(F) Knowledge concerning risk of viral infectivity and HIV
(G) Warnings and information regarding viral infectivity and HIV
(H) Communications between or among: fractionators, plaintiffs, NHF and other he-

The point to remember here is that, as of the date of the Case Management Order, May 4, 1994, the fractionators believed it was realistic to expect that the remaining MDL discovery would be completed between May 4, 1994, and July 31, 1995, a period of about fourteen months. Expert depositions were to be completed in a period of five months (i.e., during the period March 1, 1995–July 31, 1995). Because defendants had until April 30 to name their experts, the plaintiffs would have a three-month period (May 1–July 31) in which to depose them. Obviously, the parties had in mind a manageable number of experts who would need to be deposed.

This discovery schedule was not adhered to because of the subsequent diversions created by the class certification in *Wadleigh* (preceded by extensive briefing in this court) and the mandamus petition in the Court of Appeals. Following the resolution of that matter, and the decertification of the class, discovery resumed. Further orders requiring the parties to designate expert witnesses on core discovery issues were entered on July 6, 1995, and December 4, 1995. Plaintiffs designated seventeen experts, and all but three of their discovery depositions have been completed.

The present dispute arises from the fact that the fractionator defendants have designated a total of 137 common-issue expert witnesses. Plaintiffs have objected to this number as excessive and have requested an order limiting the defendants to a reasonable

mophilia organizations, the United States government, healthcare providers, blood and blood derivative suppliers and distributors, plasma procurers and trade associations and marketing consultants.
(I) Plasma collection practices, including donor screening
(J) Surrogate testing
(K) Viral inactivation
(L) Transmission of HIV by hemophiliacs to others
(M) Recalls, withdrawals and exchanges of factor concentrates
It will be noted that Items (A)–(D) are case-specific issues, rather than common issues, inasmuch as they pertain to the particular circumstances of the individual plaintiffs' cases. The remaining Items (E)–(M) are pertinent to all cases.

number. They suggest twenty-six as a maximum.

Defendants concede that they do not intend to call 137 witnesses in any particular trial, but contend that, for reasons discussed below, they nonetheless need to designate this number as possible trial witnesses. Defendants suggest that plaintiffs should choose which of the witnesses they wish to depose during the MDL proceeding. If defendants choose at any particular trial to present common-issue experts whom plaintiffs have not deposed, the solution, say the defendants, will be for plaintiffs to depose the witnesses at that time. Defendants are making no commitment that any of the 137 witnesses plaintiffs might select for depositions in the MDL would be called at any trial, and they have carefully avoided giving any indication of who the actual trial witnesses are likely to be. Thus, plaintiffs would proceed at their own risk and could well waste their time and resources deposing witnesses who will not be called at trial. In short, if defendants have their way, they reserve the right to render any expert witness depositions taken by the plaintiffs in the MDL a complete waste of time.

Defendants make a number of arguments as to why 137 is a reasonable number of witnesses, but they also advance the basic argument that this court, as transferee court under § 1407, lacks the authority to limit the number of their trial witnesses in any event:

> The role of an MDL Court is to oversee 'coordinated or consolidated pretrial proceedings.' 28 U.S.C. § 1407. This role does not include the determination of issues related only to trial.

Defendant Fractionators' Memorandum of Law in Opposition to Plaintiffs' Motion to Limit Expert Testimony, at 8. Orders that pertain to the trial of a case, say the defendants, can be made only by the "trial judge," meaning the transferor judges to whom the cases will be remanded upon completion of the MDL discovery.

### The Authority of a Transferee Court

█ Defendants fundamentally misconceive the nature of multidistrict litigation and "the role of an MDL court." The source of their confusion is their failure to understand, or at least to acknowledge, the relationship between the "pretrial proceedings" referred to in § 1407 and the trial itself. The pretrial and the trial are not, as defendants imply, two unrelated phases of the case. Rather, they are part of a continuum that results in resolution of the case, and the relationship between them is intimate. "Pretrial" proceedings are conducted to prepare for trial. A judge who has no power to impose limits as to what will happen at trial is obviously a judge who has little ability to manage pretrial proceedings in a meaningful way, since there would be no assurance that the judge's efforts are directed toward what is likely to happen at trial. That it is essential for the "pretrial" judge to have the authority to enter orders that will be binding as to the conduct of the trial is recognized by Rule 16(c)(4), (13), (14) and (15), of the Federal Rules of Civil Procedure, which gives the judge conducting pretrial conferences authority to enter a variety of orders that will shape the conduct of the trial, including authority to limit the number of expert witnesses and to establish time limits for presenting evidence at trial. Rule 16 conferences are not necessarily conducted by the same district judge who will ultimately try the case; and some district judges routinely refer Rule 16 conferences to magistrate judges who, in the absence of consent by the parties, would not even be authorized to try the case.

█ A transferee judge in a multidistrict proceeding is one to whom the Judicial Panel on Multidistrict Litigation has transferred a number of different cases pending in different districts "involving one or more common questions of fact" because the Panel has determined that such a transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The purpose of the transfer is "for coordinated or consolidated pretrial proceedings." *Id.* Unless the transferee judge has the authority to enter pretrial orders that will govern the conduct of the trial, there would be little prospect that the "coordinated or consolidated pretrial proceedings" contemplated by the

statute would "promote the just and efficient conduct of such actions." *Id.* If the transfer is to serve the legislative purpose of § 1407, the transferee judge must have the same authority that any pretrial judge has to enter orders that will ensure the relevance of the pretrial proceedings to the conduct of any trial that occurs after remand to the transferor court. Rule 16 applies to multidistrict proceedings the same as it applies to individual cases, and the transferee court may exercise the authority granted under Rule 16(c)(4) to limit the number of expert witnesses to be called at trial.

The answer to the first question posed in the introduction to this opinion, then, is that the MDL transferee judge is, by force of the statute itself, in charge of the consolidated cases for all purposes consistent with the objectives of § 1407 and of necessity has the authority to limit the number of common-issue trial witnesses. If an additional basis for that authority is desired, Rule 16 of the Federal Rules of Civil Procedure provides it.

It is true, of course, that no pretrial judge, one managing an individual case as well as one managing consolidated pretrial proceedings in a multidistrict litigation, can anticipate everything that might happen up to the point of trial. Obviously, pretrial orders containing limitations that are overtaken by events are subject to adjustment by the judge who will try the case. For instance, a designated expert witness whose deposition has been taken may die before trial, necessitating the designation of a substitute witness and another deposition before trial. But the need for such adjustments is exceptional, not routine. Normally, witness limitations work well. This is especially true in the case of expert witnesses, who often are highly paid and, short of death, likely to be available for trial. Pretrial proceedings have to be conducted on the assumption that the needs of the trial can be fairly anticipated by the pretrial judge. Any other approach would render pretrial proceedings pointless.

This is not to suggest that in the absence of unforeseen developments the transferor judges in this litigation are bound by what this court does. The extent to which any transferor judge might see fit to vary what we do here is a matter of his or her own good judgment. We would expect any error on our part to be corrected before the case went to trial. This is not a matter of trying to tie the hands of the trial judge. It is a matter of defining what this court's authority is to enter orders that will bind the parties at trial to the extent the trial judge sees fit to enforce them. (It is also a matter of determining whether the transferor court can, as a matter of law, safely adhere to the orders of the transferee judge should he or she find it otherwise appropriate to do so.) But it is obvious that the objectives of § 1407 can best be achieved when a departure from the transferee judge's pretrial orders is the exception rather than the rule, and it is this court's impression that such departures are in fact exceptional.[3]

Holding that we do have the authority, as the transferee court, to enter an order limiting the number of common-issue expert witnesses the fractionator defendants will be permitted to call at trial, so that we can determine what depositions need to be taken, we turn now to the question of what that number should be.

### A Reasonable Limit for These Cases

■ A threshold question raised by defendants is what is meant by "common-issue expert witnesses." Defendants indicate that one reason they have listed so many expert witnesses is that they believed they had to include not only opinion witnesses but also experts who will testify as fact witnesses on common issues. For instance, a highly skilled employee of one of the fractionators, such as the supervisor of a plasma collection center, might be called to testify as a fact witness concerning the procedures followed at the center. This would have to do with plasma collection, a common issue, and the witness would be an "expert" in the sense of knowing far more about the procedures than the jury would know. Federal Rule of Evidence 702. But unless the witness is to be called to offer *opinion* testimony based on his or her expertise, the court does not consider the witness an "expert" for purposes of

---

**3.** The writer happens to be a current member of the Judicial Panel on Multidistrict Litigation.

this discussion. (Nor does it appear to be the kind of witness the parties had in mind when they submitted to us the language concerning the schedule for "Expert Identification" included in the Case Management Order, *supra* at p. 635.) To the extent that there has been any genuine uncertainty about what is meant by a common-issue "expert," let it be clear that we mean an expert who will be called by a fractionator to give *opinion* testimony on an issue which is common to all cases.[4]

One of defendants' main arguments is that because the facts of individual cases differ from each other, defendants should not be required to use the same relatively small group of common-issue expert witnesses in all cases that might be tried. Because they have not yet had the opportunity to do the case-specific discovery they need to try each of the individual cases in the MDL, they claim a need to designate a large number of possible expert witnesses in order to cover themselves for any contingency.[5]

■ The argument is not persuasive. The facts concerning the hemophilia of an individual plaintiff, his HIV infection and his use of concentrates should not require different experts to testify on common issues from case to case. All plaintiffs claim to have been infected by using the concentrates of one or more of the defendants, and all plaintiffs charge one or more defendants with the same negligent acts and omissions. Defendants' argument that they need to complete case-specific discovery before they can designate their common-issue expert witnesses is difficult to reconcile with the fact that they have deposed plaintiffs' common-issue experts without any indication that their interrogation has been hampered by a lack of case-specific information. To be consistent, it seems that defendants should have requested that case-specific discovery be completed before they undertook to determine by deposition what plaintiffs' common-issue experts will say at any trial that occurs. But, of course, any such suggestion would turn the MDL proceeding on its head. Section 1407 consolidations take place when there are "civil actions involving one or more *common* questions of fact ..." The multidistrict proceeding is not the appropriate mechanism for the conduct of *case-specific* discovery. By definition, that discovery is not of general interest to the parties in all of the individual cases which comprise the MDL.[6] In this litigation, for instance, it would make no sense for members of Plaintiffs' Steering Committee to attend the depositions of the plaintiffs in each of the individual cases, or the depositions of their treating physicians, and no one has suggested that they have any such intention. Nor would it be necessary for a fractionator not named in a particular case to attend the depositions of the plaintiff and treating physician in that case. These witnesses would not be testifying about *common* issues.

Adopting defendants' view of MDL proceedings would mean that discovery concern-

---

4. This would not include expert witnesses, such as physicians, who might be called by a defendant to give expert testimony concerning the medical condition of a particular plaintiff. The witness would be an expert, and would be giving opinion testimony, but the opinion would not relate to a common issue in the MDL litigation.

5. In fact, considerable case-specific discovery has been furnished in the form of "Patient Profile Forms" most of the MDL plaintiffs have completed. This form was agreed upon by the parties and made an exhibit to the Case Management Order of May 5, 1994. The form calls for the plaintiff's history of hemophilia treatment, the date the plaintiff contracted HIV, the date of the HIV diagnosis, whether the plaintiff has AIDS, and, if so, when it was diagnosed, and a listing of all factor concentrates the plaintiff used during the years 1978 through 1985, the period during which almost all infections occurred.

6. Should it turn out that in a particular case there are medical and other scientific questions that are so specific to the facts of that case that the defendants do indeed require a "special" kind of expert, not designated in the MDL, to fairly present their position on an MDL common issue as it impacts that case, we would regard that as *case-specific* situation to which our witness limitation would not apply. We are extremely doubtful that there are any such cases, and assume that trial judges will carefully examine any claim by a defendant that the subject matter of any proposed testimony by a common-issue defense expert not designated in the MDL could not have been covered equally well by a witness who was or could have been designated within the limitation we will fix.

ing the "one or more common issues of fact" contemplated by § 1407 would not be completed, or perhaps even commenced, until the case-specific discovery was finished. This would prolong the MDL indefinitely, force the parties to await the completion of discovery that would be of no relevance to their particular cases and frustrate the possibility of settling individual cases between completion of the common discovery and completion of case-specific discovery. Although we have not made a formal decision on the matter as yet, and will hear from the parties before we do, our present inclination is to suggest to the Panel after completion of the common-issue discovery that the individual cases be remanded to the transferor districts. We see no point in retaining jurisdiction of the cases during the case-specific discovery, which can probably be best conducted after remand. It may be that some of the transferor courts will wish to address dispositive motions before expensive and time-consuming case-specific discovery is undertaken.

Aside from the procedural convolution of defendants' position, a number of circumstances tend to belie their need for a large group of experts from which to select witnesses who are particularly suited for individual cases. Among these circumstances is the fact that in two cases pending in Indiana and Arizona state courts, the fractionators have filed these *same lists* of 137 common-issue experts. Fact-specific discovery has been completed in the Indiana case, and, except for the depositions of defendants' common-issue experts, it is ready for trial. The fractionators have resisted the efforts of plaintiffs in the Indiana and Arizona cases to require the designation of a smaller number of experts who will actually be used at the trials. Defendants offer no explanation to this court as to how their tactics in the Indiana and Arizona cases are consistent with the argument one of their attorneys made to us in open court when we first discussed plaintiffs' objections to the number of expert witnesses defendants had designated:

I was frankly surprised when the Plaintiffs' Steering Committee said that ... there are only 12 or 14 experts that they wish to use ... in all these many different trials. [W]e took a different tack. We said if we are designating experts for one trial or two trials or three trials, we may be able to designate a small number of experts ... [W]e will designate a lot of experts, not to call a hundred or 50 experts in a particular trial, but so that as we try hundreds of cases potentially around the country, we can call the experts in each trial that we think most appropriate.[7]

Another circumstance which undercuts defendants' contention about the need for this long list of experts has been mentioned earlier in this opinion. At the time defendants agreed upon the terms of the Case Management Order, they had already tried each of the thirteen cases that have been tried in the history of this litigation. They knew all there was to know about whether they would need different opinion witnesses on common issues, depending upon case-specific facts. The deposition of an expert witness in this litigation has typically taken more than one day, and understandably so, considering the complexity of the testimony and the volume of material to be covered. The defendants joined plaintiffs in proposing to this court, for incorporation in the Case Management Order, a discovery schedule that allowed approximately twelve weeks for plaintiffs to depose their experts. The notion that 137 expert witnesses, or any such number, could be deposed in twelve weeks is absurd. If plaintiffs deposed two defense experts a week, which is generous, that would mean 24 witnesses could be deposed in twelve weeks' time. This strikes the court as something like what the defendants actually had in mind at the time they agreed upon the terms of the Case Management Order in May of 1994. Whatever has happened in the meantime to change defendants' attitude, it seems unrelated to the legitimate needs of the litigation.

Defendants have attempted to break down the various "core issues" listed in the Pretrial Management Order (Note 2, *supra*) into a

---

**7.** Transcript of proceeding of June 4, 1996, pp. 115–116 quoted in Plaintiffs' Reply Memorandum to Motion to Limit the Number of Fractionator Defendants' Expert Witnesses, p. 5.

much larger number of subcategories, to bolster their argument that a large number of experts will be required to cover the common issues. This attempted splintering of the core issues is illustrated by defendants' suggestion that they might need different experts to testify to what was known about HIV before 1983 and after 1983. The idea that an expert on HIV would be so specialized as to be able to testify to what was known about the virus in 1983, but not before, or not after, is implausible on its face. If it is possible to find such an expert (where would one look?), clearly it would be easier to find one who is knowledgeable about what was known during the entire span of time relevant to the litigation.

The fact is that, rather than being specialized in only one facet of a core issue, an expert in any area of this litigation is often knowledgeable about more than one core issue and testifies accordingly. This court presided over one of the thirteen cases that was tried prior to the MDL consolidation. It was the case of *Poole v. Alpha*, No. 86 C 7623. Stephen Poole was a hemophiliac who became infected with HIV as a result of using factor concentrate and eventually developed AIDS, from which he died, leaving a widow and children surviving. His estate sued these same four fractionators, alleging that Poole had used each of their concentrates. He alleged the same negligent acts and omissions that have been commonly alleged in the MDL cases, and the defenses raised by the fractionators were the same as those they have raised in the other cases. After five and one half weeks of trial in October and November of 1993, the jury returned a special verdict finding that none of the fractionators had been negligent in any of the ways claimed by plaintiff.[8]

If there is any reason to believe that the common-issue expert testimony in the Poole trial was different in any essential way from what may be anticipated in the trial of any other MDL case, the defendants have not told us what it is.[9] In the course of this proceeding, we have from time to time found it useful to draw on our experience in *Poole*, and have done so explicitly. Presumably the defendants anticipated, before they filed their briefs on the questions under discussion, that to some extent we would be inclined to do so here as well. In the absence of some demonstration to the contrary, we believe the expert testimony presented in *Poole* was fairly typical of what will be presented in the trial of any remanded case. It will be instructive, therefore, to review what took place in *Poole*.[10]

The Poole estate called eleven experts to testify on issues that were the same as the common issues in this MDL litigation.[11] Eight of the witnesses were presented live, two by written deposition (Rodell, Hink) and one by a video deposition (Ratnoff).

The four fractionator defendants combined called a total of twelve expert witnesses to give opinions concerning common issues. Alpha called four of the witnesses (McAuley, Mealey, Weidman, Preston). Miles (the predecessor of Bayer Corporation) called three (Aledort, Levy, Mozen). Armour called two (Kessler, Rodell). Baxter called one (Levine). The court is unable to tell from its notes which defendant or defendants called the remaining two experts (Aaronson, Abildgard).

**8.** The judgment for defendants was reversed on appeal for reasons not related to the expert witness questions under discussion in this opinion. *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638 (7th Cir.1995).

**9.** *Poole* may have required somewhat more opinion testimony than most of the other cases, since plaintiff was contending, and offered opinion testimony to prove, that a person once infected by the injection of a contaminated factor concentrate can suffer the aggravation of his condition by the subsequent injection of another contaminated concentrate. *See, Gruca*, 51 F.3d at 641–643. Much of the opinion testimony concerned this vigorously disputed issue, which is not present in all MDL cases.

**10.** The review is based on our handwritten notes of the trial.

**11.** These were the witnesses Weiser, Subramanian, Terman, Hildebrandt, Feldman, Berger, Ratnoff, Rodell, Drees, Hink and Trobisch. The court is unsure from its notes whether all eleven gave opinion testimony, but we are nonetheless using the number eleven so as not to risk minimizing the number of opinion witnesses likely to be called in an MDL trial.

None of the defense experts gave opinion testimony about any matter that concerned fewer than all four of the defendants. This demonstrates the extent to which the issues are indeed common in these cases. But more than that, it is part of the explanation for why the defendants needed to call only twelve opinion witnesses. The common-issue testimony that benefits one defendant necessarily benefits all of the defendants just about equally.[12] An expert who gives an opinion favorable to the defendants on the question of whether the defendants should have begun heat treating their products before they did, or whether they should have screened out donors infected with hepatitis, will be giving testimony that, if accepted by the trier of fact, will be beneficial to all defendants. It will not be necessary for each defendant to call its own experts on those subjects. To do so might even risk taxing the patience or losing the attention of the jury, which, at best, has to sit through a long, complex trial. Counsel for each defendant can, of course, put additional questions to the witnesses called by other defendants, as happened in *Poole.*

Another reason the defendants were able to present a successful defense with only twelve witnesses is that some of the witnesses gave opinions that related to more than one of the common issues. The witness Milton Mozen, for instance, testified on numerous subjects, as did the witness Peter Levine.

Much of the opinion testimony favorable to defendants was not even offered through their own experts. It was elicited on cross-examination of plaintiff's experts, often by having them agree with the opinions expressed by recognized authorities in learned treatises. Whole areas of potential dispute were eliminated in just this fashion by trial counsel well-versed in the relevant medical literature.

Defendants argue that another reason for their long list of experts is that they may be compelled to engage in simultaneous trials throughout the country, necessitating the use of different expert witnesses at the different trial locations. The plaintiffs respond that this prospect is far-fetched, and the court agrees. First, defendants' suggestion that there may be hundreds of federal trials seems unlikely in view of the fact that during the decade or more since the first case was filed there have only been thirteen trials, state and federal. Most of the cases that have been resolved have either been settled or decided in defendants' favor on dispositive motions.[13] But even assuming a large number of trials, it is customary for courts to defer to the engagements of counsel and to adjust their trial calendars accordingly. Certainly this court does that routinely and would be surprised if that is not what occurs as a general rule after remand to the transferor districts. Putting aside altogether the convenience and availability of expert witnesses, the small number of trial counsel who are experienced in this highly specialized litigation makes it unlikely that a significant number of simultaneous trials will occur.

Defendants say they have a preference for presenting their expert witnesses live, rather than through video depositions, and that this requires a large array from which to choose, because these are "extremely busy people" who "may be able to testify at no more than one or a handful of trials."[14] We have no way of knowing how many times any particular defense expert may be willing to testify at trial. Nor, as we have just indicated, do we have any way of knowing how many trials

---

**12.** The jury was given the customary instruction that "In determining whether any proposition has been proved, you should consider all of the evidence bearing on the question without regard to which party produced it."

**13.** Some plaintiffs face considerable difficulty in terms of product identification and the statute of limitations. Many plaintiffs used the factor concentrate of more than one fractionator. If a plaintiff is unable to prove which defendant's concentrate caused his infection, the substantive law of some states will prevent his recovery. Causation is a case-specific issue which we cannot handle in the MDL. Limitations questions—when should the plaintiff have known that he had a claim, and did he file it on time?—are also case-specific and will have to await the attention of the transferor courts after remand.

**14.** Defendant Fractionators' Memorandum of Law in Opposition to Plaintiffs' Motion to Limit Expert Testimony, p. 5.

there are going to be. But if these pretrial proceedings are to be conducted with any semblance of the economy sought by the consolidation, there must be a reasonable limit to the number of witnesses to be deposed, and therefore to the number of witnesses who are eligible to testify at trial. Any speculation as to the number of trials, and the attitudes of extremely busy people—who stand to earn considerably more money by testifying than by engaging in their normal work (and some of whom are employed by the defendants and have no choice in the matter in any event) does not afford the court a satisfactory basis for determining a reasonable number.[15]

Granting that there must be some leeway for the designated expert who may for some unforeseen reason become unavailable to testify at trial, it does not require the designation of 137 witnesses to deal with that contingency. A recent experience of this court in a patent case illustrates the kind of adjustment that can be made. The deposition of one party's designated expert had been taken for several days, at great expense, but as the trial date drew near the witness announced that he was no longer willing to testify. The adverse party who had taken the deposition of the witness objected to having to depose a substitute. The problem was solved by retaining another expert who read the first expert's deposition, agreed with it, and stipulated that his trial testimony would differ in no material way from the first expert's deposition testimony. In that way, the need to take a second deposition was avoided. The same procedure might work just as well in this MDL in the event that any expert designated by defendants might have to be replaced. Presumably, defendants' designated experts will not be expressing opinions that other equally well-qualified experts would find unacceptable.

Another reason defendants give for the long list is their alleged need to use "local" common-issue experts in the trial of particular cases. They suggest that juries would be more likely to accept the testimony of ex-perts from their own locales than that of experts brought in from a distance. This is a highly speculative proposition, especially in terms of a subject matter as complicated as that involved in these cases. Even if it were desirable to use "local" experts, there may be no suitable ones residing in the locality. In the *Poole* trial, it is our recollection that none of the twelve common-issue experts called by the defendants resided in Illinois. They came from widely separated parts of the United States and one came from Germany. But even if there were something to defendants' argument, it would not be possible to conduct consolidated discovery in an MDL if each party were allowed to designate common-issue experts who resided in every venue where a trial might possibly take place. This would result in the absurd kind of number that defendants have designated here. The economy that is one objective of § 1407 sometimes requires compromise. Loss of the speculative benefit from designating a multitude of "local" experts seems a small price to pay for a reasonable limit.

## CONCLUSION

Defendants have placed the court in the position of having to determine, without any help from them, what reasonable number of common-issue experts they really need to designate for trial. They say they need 137 and can designate no smaller number at this time. Yet, this is the time we need the designation. Plaintiffs have to know whom to depose, so that they can get on with it, complete the common-issue discovery and be ready for a remand to the transferor districts.

Based on our experience in the *Poole* trial and the additional insights we have gained in presiding over the MDL, we believe that 24 common-issue expert witnesses will be a sufficient number to enable the defendants to make an effective presentation of their position on common issues at any trial that is likely to occur. This is twice the number these defendants utilized at the *Poole* trial, and it leaves them ample room for any addi-

---

**15.** The court is not even clear about the defendants' allegedly strong preference for live testimony. In the *Poole* trial, two of the defendants opinion witnesses (Levy, Levine) testified by written deposition and another (Aaronson) by video deposition.

tions or variations they might think appropriate.

In the decade this litigation has been pending, the defendants have learned the identities of all recognized experts in the relevant subject matter and have used many of them as witnesses or consultants. They should be able to select their 24 common-issue experts without difficulty within the time we will provide.

IT IS HEREBY ORDERED that:

1. By January 20, 1997, the fractionator defendants jointly shall designate up to 24 common-issue expert witnesses the defendants, or any of them, may call to testify at any trial of an MDL case.

2. If the defendants do not desire to make a joint designation, but instead desire to designate individually, then each of the four defendants shall designate up to six common-issue expert witnesses it may call to testify at the trial of any MDL case.

3. Whether the defendants designate jointly or individually, any defendant shall be permitted to call at trial any common-issue expert witness designated by itself or any other defendant pursuant to this order.

4. The fractionator defendants shall not be permitted to call at the trial of any MDL case a common-issue expert witness who has not been designated by itself or another fractionator defendant pursuant to this order, unless the trial judge, in his or her discretion, permits it for good cause shown.

5. The time the plaintiffs will need to complete the depositions of witnesses designated by defendants pursuant to this order will be a subject of the next status conference.